2024 IL App (1st) 220886
Nos. 1-22-0886 & 1-22-0891 (consolidated)
Opinion filed: February 29, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-0891

| | | |
|---|---|---|
| MARCUS LEDEAUX, a Disabled Person , | ) | Appeal from the |
| by His Co-Guardians and Co-Conservators | ) | Circuit Court of |
| Mark Ledeaux, Lisa Ledeaux, | ) | Cook County |
| and Kyndra Ledeaux; MARK | ) | |
| LEDEAUX; and LISA LEDEAUX, | ) | |
| | ) | No. 10 L 8503 |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOTOROLA SOLUTIONS, INC., | ) | Honorable |
| | ) | Irwin J. Solganick, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

No. 1-22-0886

| | | |
|---|---|---|
| ENRIQUE DANIEL ARBALLO, an | ) | Appeal from the |
| Incapacitated Person by Permanent Guardian | ) | Circuit Court of |
| Henry Arballo; ROSA MARIN | ) | Cook County |
| ARBALLO; and HENRY ARBALLO, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 19 L 10140 |
| v. | ) | |
| | ) | |
| MOTOROLA SOLUTIONS, INC., | ) | Honorable |
| | ) | Irwin J. Solganick, |
| Defendant-Appellee. | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hoffman and Ocasio concurred in the judgment and the opinion.

**OPINION**

¶ 1      Plaintiffs Marcus Ledeaux (Ledeaux) and Enrique Daniel Arballo (Arballo) were born with severe birth defects that allegedly were caused prior to their conception, when Ledeaux's father and Arballo's mother were exposed to reproductively toxic chemicals while employed at a semiconductor manufacturing facility in Arizona owned by defendant, Motorola Solutions, Inc. (Motorola). Plaintiffs, by and through their parents, brought separate actions in the circuit court of Cook County against Motorola for negligence, willful and wanton misconduct, and parental loss of child consortium. In both cases, the circuit court granted summary judgment for Motorola, finding that it did not owe plaintiffs a duty under Arizona law. The court also denied plaintiffs leave to amend their respective complaints to allege punitive damages. In this consolidated appeal, we reverse the orders granting summary judgment to Motorola on both complaints and denying them leave to amend. We remand for further proceedings.

¶ 2      First, we address Ledeaux's appeal. Then we will consider Arballo's appeal.

¶ 3                                    I. Ledeaux

¶ 4      By way of background, Motorola is headquartered in Illinois and has semiconductor manufacturing plants in Arizona as well as a facility in Austin, Texas. Semiconductors are the basic materials needed to make integrated circuits, which are wafers made of silicon on which thousands or millions of tiny transistors, capacitors, and diodes are fabricated (manufactured). An integrated circuit is the fundamental building block of all modern electronic devices.

¶ 5      The manufacturing process of an integrated circuit largely takes place in so-called "clean rooms," which are controlled environments designed to prevent airborne contaminants from contacting semiconductor components during the manufacturing process. In the manufacturing process, a thin film layer that will form the wiring, transistors, and other components is deposited on the wafer. The thin film is coated with photoresist, a type of light-sensitive protective coating.

During the photolithography process, the circuit design is projected and transferred onto the wafer with ultraviolet light. The wafer then goes through an etching process whereby any unnecessary materials are removed so that only the desired circuit patterns remain on its exterior. There are two types of etching: dry etching and wet etching. Dry etching uses plasmas or etchant gases to remove the unwanted wafer layers. Wet etching uses liquid chemicals to remove the unwanted wafer layers.

¶ 6    From 1980 to 2002, Ledeaux's father, Mark, worked at Motorola's Mesa, Arizona, facility, where he was exposed to various chemicals that allegedly affected his sperm, resulting in Ledeaux's later birth defects. Ledeaux's mother became pregnant in November 1996 and gave birth to him in August 1997. Ledeaux has been diagnosed with autism, cerebral palsy, static encephalopathy (a brain disorder), and hemiplegia (paralysis on one part of the body).

¶ 7    Ledeaux's lawsuit is one of several separate personal injury cases filed in the circuit court of Cook County against Motorola, relating to severe birth defects in children of former Motorola employees who were exposed to toxic chemicals in the workplace. Eventually all the plaintiffs filed a combined fourth amended complaint against Motorola, which pleaded counts for negligence, willful and wanton misconduct, strict liability, breach of an assumed duty, and parental loss of child consortium.

¶ 8    In February 2016, Motorola brought motions to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2010)) against two of the plaintiffs, Sarina Finzer and Jeremy Hardison. Finzer's birth defects allegedly were caused by her father's exposure to toxic chemicals in Motorola's semiconductor manufacturing facility in Arizona; Hardison's birth defects allegedly were caused by his father's exposure to toxic chemicals in Motorola's semiconductor manufacturing facility in Texas. The circuit court determined that

Arizona and Texas law applied, respectively, to the substantive issues in Finzer's and Hardison's cases and that Illinois law governed the procedural issues.

¶ 9 The circuit court dismissed with prejudice all of Finzer's and Hardison's claims in the fourth amended complaint; the claims of the remaining plaintiffs remained intact. On appeal, we reversed the dismissal of Finzer's and Hardison's claims for negligence and willful and wanton misconduct under Arizona and Texas law and Finzer's parents' claim for parental loss of child consortium under Arizona law, finding that the respective plaintiffs had adequately pleaded a duty, a breach thereof, and proximate cause. *Ledeaux v. Motorola, Inc.*, 2018 IL App (1st) 161345, ¶¶ 53-54 (hereinafter *Ledeaux I* to distinguish it from the present case). We affirmed dismissal of Hardison's parents' claim for parental loss of child consortium under Texas law because such a claim is not a valid cause of action in Texas. *Id.* ¶ 54. Ledeaux's claims were not at issue and never addressed on appeal, even though his name appeared first in the case caption.

¶ 10 On remand, the circuit court ordered that each individual plaintiff's claim in the fourth amended complaint, with the exception of Jonathan Johnson and Ledeaux, be administratively dismissed and refiled with new case numbers.

¶ 11 On September 24, 2019, Ledeaux, through his parents, filed his seventh amended complaint alleging that his birth defects were proximately caused by Motorola's negligence and willful and wanton misconduct in knowingly exposing his father, Mark, to reproductively toxic chemicals.

¶ 12 Ledeaux alleged that Motorola acted negligently by failing to take reasonable measures to protect Mark from exposure to the toxic chemicals, including providing him with adequate personal protective equipment; failing to warn Mark about the dangers that the toxic chemicals posed to his reproductive health, including the potential for birth defects and miscarriages; and

failing to design, approve, and/or implement proper industrial hygiene policies and/or adequate exhaust, ventilation, and air circulation systems.

¶ 13    Ledeaux further alleged that Motorola acted willfully and wantonly by concealing from Mark his level of exposure to the toxic chemicals and gas, by misrepresenting that the exposure posed no adverse health consequences to his future offspring, and by purposely obtaining inaccurate and misrepresentative data falsely showing that Mark's exposure to the toxic chemicals and gas was not unsafe to himself or to his future offspring.

¶ 14    Ledeaux's parents also asserted a claim for parental loss of child consortium.

¶ 15    The parties engaged in extensive discovery. We proceed to set forth the relevant evidence obtained during the discovery process.

¶ 16    Mark testified during his deposition that he began working at Motorola's Mesa facility in 1980 as a process monitor in the photolithography department. He received general orientation training that explained the process of manufacturing wafers. The training consisted of videos and slideshows and some safety information about the chemicals used at the facility.

¶ 17    At the time of Ledeaux's conception and birth, Mark was working five days a week in the Mesa facility's backgrind department, where silicon was removed from the back of the wafers so as to reduce their thickness and to allow stacking and high-density packaging of the integrated circuits. The machine used to grind down, or remove, the silicon was called a disco grinder. Mark's job was to load the wafers onto a robotic arm extending from the disco grinder. The robotic arm then flipped the wafers over so that the disco grinder could mechanically grind the backside of the wafers to achieve the desired thickness. After grinding was complete, Mark would remove the wafers from the disco grinder and place them in a clean-room hood, so as to prevent contaminants from building up on the wafers. Mark also cleaned the disco grinder and fixed it when it

malfunctioned. While performing his work, Mark wore a clean-room suit, smock, hair bonnet, and latex gloves.

¶ 18    James Stewart, plaintiff's environmental health engineering expert, provided a report on the various chemicals Mark would have been exposed to while working in the backgrind department. Such chemicals include acetone, isopropyl alcohol, ethyl benzene, hydrofluoric acid, and nitric acid.

¶ 19    Stewart discussed the history of notifications to Motorola regarding reproductive hazards posed by chemicals used in the manufacturing of semiconductors. In 1981, Motorola received notification from DuPont regarding the reproductive toxicity of certain glycol ethers. In response, Motorola noted the need to "reinforce" exhaust ventilation and protective clothing requirements. Also in 1981, material safety data sheets received from manufacturers of photoresist warned of birth defects caused by glycol ethers on male and female animals. In 1982, Kodak sent Motorola a warning that glycol ethers have teratogenic effects (*i.e.*, the ability to disturb the growth and development of an embryo or fetus). It recommended that Motorola reduce exposures and inform employees of the warning. The Semiconductor Industry Association (SIA) issued an additional warning in 1982 advising the industry to "evaluate, assess, and control glycol ether exposures."

¶ 20    To protect its workers from chemical exposure, Motorola provided them with latex gloves and other protective equipment, monitored their chemical exposures to ensure they did not exceed threshold limit values (TLVs) established by the American Conference of Governmental Industrial Hygienists or the permissible exposure limits (PELs) established by the Occupational Safety and Health Administration (OSHA), developed maternity notification forms to inform their physicians about their chemical exposures, offered access to material safety data sheets informing them about the chemicals to which they were being exposed, cofounded the SIA and participated in a worker

task force to further limit its workers' chemical exposures, and hired an occupational medicine physician.

¶ 21    In 1983, Mike May, a certified industrial hygienist working for Motorola, announced the "Glycol Ether Monitoring Project," the purpose of which was to assess exposures to glycol ethers. This announcement was made about one year and seven months after the warning letter from DuPont. In 1994, Motorola formally eliminated glycol ethers from its semiconductor manufacturing.

¶ 22    Stewart criticized Motorola for taking more than one year to eliminate glycol ethers from the manufacturing process. He further criticized Motorola for failing to adequately train Mark and provide him with the necessary personal protective equipment for the tasks he was required to perform. Stewart was especially critical of the latex gloves provided to Mark, which were not effective protection against the chemicals used in Motorola's semiconductor manufacturing plant. Stewart concluded that "[w]orkplace conditions present at the Motorola facility resulted in a hazardous and unsafe workplace."

¶ 23    Ledeaux filed a report from Dr. Robert Harrison, an occupational health physician. Harrison cited a statement from IBM in 1982 that set forth the best practices in the semiconductor industry for ensuring its workers' reproductive health from chemical toxicants. Motorola departed from these standard industry practices by failing to carefully investigate each of its chemicals so as to understand their potential reproductive hazards and to replace them to the extent technologically feasible, failing to provide adequate safeguards such as ventilation controls and proper personal protective equipment, and failing to fully advise workers of the nature of all potential reproductive risks.

¶ 24    Harrison was critical of Motorola's claims that its employees' chemical exposures were not greater than the PELs and TLVs. Harrison stated that PELs and TLVs do not completely and adequately protect workers and their offspring from reproductive harm. This is in part because chemicals with PELs and TLVs are not used in clean rooms in isolation but instead are used in conjunction with other chemicals that together cause genetic damage to workers' future offspring. Also, "[r]eproductive and other latent outcomes are usually not the basis for setting exposure limits."

¶ 25    Harrison concluded that Motorola's "facilities and work practices were improper and did not meet the appropriate standard of care within the industry or within the occupational medicine community. Motorola did not provide a safe place to work or the measures to protect the Employee Parents from harm to their future offspring."

¶ 26    Harrison was deposed, and he testified consistently with his report. Harrison stated that there were scientific studies as early as the 1970s and 1980s showing that paternal exposure to organic solvents caused birth defects in their future offspring. Harrison specifically cited a publication from OSHA in 1979, a study performed by Dr. Wharton in 1982, and a paper published in the Journal of the American Medical Association (JAMA) in 1985. According to Harrison, the majority of the peer-reviewed scientific literature as of 1991 found a causal connection between a father's exposure to toxic substances and the subsequent birth defects in his offspring.

¶ 27    Motorola confronted Harrison with a 1989 scientific study authored by A.D. McDonald and J.C. McDonald, who were members of a nonprofit scientific research organization in Quebec. The McDonald study examined the correlation between a father's employment in various occupations and pregnancy outcome. Pertinent here, the authors examined whether workers in the manufacturing sector who were involved in the fabricating, inspecting, assembling, installing, and

repairing of electronic equipment had a higher incidence of offspring born with birth defects. The authors concluded that there was no correlation between the fathers' occupation in the manufacturing sector and "any adverse effect on their progeny." Harrison was critical of the McDonald study.

¶ 28    Ledeaux filed a "joint causation report" (joint report) prepared by four medical experts with different specialties: Dr. Cynthia Bearer (neonatology), Dr. Donald Mattison (obstetrics-gynecology), Dr. Richard Finnell (genetics), and Dr. Robert Cabrera (genetics). The joint report addressed causation in the multiple personal injury cases against Motorola pending in the circuit court of Cook County.

¶ 29    The joint report discussed a 1992 study from the SIA and a 1993 study from IBM identifying reproductive toxins commonly used during the semiconductor manufacturing process. In pertinent part, the SIA study identified acetone, nitric acid, and hydrofluoric acid as reproductive toxins; the IBM study identified hydrofluoric acid and isopropyl alcohol. Harrison testified that the SIA and IBM studies were well known within the semiconductor industry "long before their results were announced."

¶ 30    The joint report also discussed a 2008 report authored by Ching-Chun Lin and his colleagues at the Institute of Occupational Medicine and Industrial Hygiene (Lin report), which looked at lethal birth defects in the offspring of male semiconductor workers from 1980 to 1994. The Lin report concluded that the children of male semiconductor workers were at increased risk of birth defects, congenital heart anomalies, and death due to their fathers' exposure to chemicals associated with reproductive toxicity, including ethylene glycol ethers and hydrofluoric acid. The Lin report posited that, when such chemicals were absorbed into the seminal fluid, intercourse

during pregnancy could lead to maternal systemic absorption of the chemicals and eventual birth defects in the developing fetus.

¶ 31    The joint report cited other epidemiological studies showing that paternal exposure to organic solvents in the semiconductor industry (such as ethyl benzene) are associated with birth defects. These associations "are due to a direct effect on gametic DNA, *i.e.* the DNA inside sperm, but, an indirect effect is also possible in humans, as toxicants are also transmitted to the mother from contaminated clothing or via seminal fluid."

¶ 32    The joint report concluded that the workplace exposure to toxic chemicals and substances in Motorola's semiconductor manufacturing facilities has "the capacity to cause the adverse reproductive outcomes experienced by the offspring Plaintiffs. Moreover, the exposures in question were plainly sufficient to cause these injuries."

¶ 33    Ledeaux filed a supplemental report from Bearer, Mattison, Finnell, and Cabrera noting Stewart's findings regarding Mark's exposures to acetone, ethyl benzene, isopropyl alcohol, hydrofluoric acid, and nitric acid. The supplemental report concluded that Mark's "occupational exposures to reproductive toxins *** at Motorola facilities were a substantial factor and proximate cause of the injuries and birth defects suffered by [Ledeaux]." The supplemental report ruled out any theoretical alternative explanations for Ledeaux's injuries.

¶ 34    Following discovery, Motorola moved for summary judgment on Ledeaux's complaint. The circuit court granted the motion, finding that Motorola owed Ledeaux no duty of care under Arizona law and therefore that the negligence, willful and wanton conduct, and parental loss of child consortium counts fail. In light of its grant of summary judgment in favor of Motorola on the willful and wanton conduct count, the circuit court also denied Ledeaux's motion to amend the complaint to allege punitive damages. Ledeaux appeals.

¶ 35     Initially, Ledeaux argues that, under the law of the case doctrine and *stare decisis*, our holding in *Ledeaux I*, 2018 IL App (1st) 161345, regarding the existence of a duty on the part of Motorola was binding on the circuit court. The law of the case doctrine prohibits reconsideration of issues that have been decided in a prior appeal in the same case. *In re Christopher K.*, 217 Ill. 2d 348, 365 (2005). The purpose of the law of the case doctrine is to protect settled expectations of the parties, ensure uniformity of decisions, maintain consistency during the course of a single case, effectuate proper administration of justice, bring litigation to an end, and maintain the prestige of the courts. *Norris v. National Union Fire Insurance Co. of Pittsburgh*, 368 Ill. App. 3d 576, 581 (2006). The doctrine of *stare decisis* requires a court to follow the decisions of higher courts on the issue before it. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008).

¶ 36     *Ledeaux I* did not involve the same issue in the same case as here, and therefore neither the law of the case doctrine nor *stare decisis* applies. *Ledeaux I* involved the combined fourth amended complaint filed against Motorola by multiple plaintiffs seeking recovery for their birth defects. *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 11. Marcus Ledeaux and his parents were listed first in the case caption, but their claims were not before this court on appeal. Instead, the appeal involved review of the circuit court's order dismissing only Hardison's and Finzer's claims under section 2-615 of the Code. *Id.* ¶¶ 10-12. We reversed the dismissal of their negligence and willful and wanton conduct claims and remanded. In so holding, we took all their well-pleaded allegations as true, as required when deciding a section 2-615 motion (*id.* ¶ 14), and found that each claim sufficiently alleged a duty owed to them by Motorola. *Id.* ¶¶ 39, 49.

¶ 37     By contrast, the instant case involved the disposition of Ledeaux's claims against Motorola for negligence and willful and wanton misconduct, not Hardison's and Finzer's claims. The instant

case also involved the resolution of Motorola's summary judgment motion, which unlike the section 2-615 motion at issue in *Ledeaux I* did not require the circuit court to take all well-pleaded allegations in Ledeaux's complaint as true. Rather, the circuit court was required to look at the evidentiary record outside the complaint and determine whether there were any genuine issues of material fact and whether Motorola owed Ledeaux a duty as a matter of law. See 735 ILCS 5/2-1005(c) (West 2020). As the parties, procedural posture, and issues in *Ledeaux I* were dissimilar to the instant case and *Ledeaux I* did not involve the rendering of a decision as to whether Motorola was entitled to summary judgment against Ledeaux's claims, neither the law of the case doctrine nor *stare decisis* applied.

¶ 38    We proceed to address the merits of Ledeaux's appeal. First, Ledeaux argues that the circuit court erred by granting summary judgment for Motorola on his negligence claim. The parties agree that Illinois law governs the procedural issues in this case, such as the applicable standard for when summary judgment may be granted. In Illinois, summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 38. Review is *de novo*. *Id.*

¶ 39    The parties also agree that we are to apply Arizona law to the substantive issues (such as whether the circuit court erred in finding that Motorola owed Ledeaux no duty of care). To establish a defendant's liability in Arizona for a negligence claim, plaintiff must prove a duty requiring defendant to conform to a certain standard of care, defendant's breach of that standard of care, a causal connection between the breach and the resulting injury, and actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (*en banc*). Whether a duty exists is a matter of

law for the court to decide. *Id.* The elements of breach and causation are factual issues decided by the jury. *Id.*

¶ 40    For years Arizona, like most jurisdictions, used foreseeability as a factor in determining duty. *Quiroz v. ALCOA, Inc.*, 416 P.3d 824, 828 (Ariz. 2018). However, in *Gipson*, the Arizona Supreme Court determined that the foreseeability of an injury is a question of fact reserved for the jury and is "more properly applied to the factual determinations of breach and causation than to the legal determination of duty." *Gipson*, 150 P.3d at 231. Therefore, *Gipson* held that "foreseeability is not a factor to be considered by courts when making determinations of duty." *Id.* Instead, duty in Arizona is now based either on relationships created by public policy or on special relationships recognized by the common law, contracts, or conduct undertaken by defendant. *Quiroz*, 416 P.3d at 829.

¶ 41    Public policy creating a duty in Arizona is based on Arizona and federal statutes and the common law, specifically case law and Restatement sections consistent with Arizona law. *Id.* at 829, 831. An Arizona statute reflecting public policy creates a duty when plaintiff falls within the class of persons protected under the statute and the harm that occurred to him is the type of harm that the statute sought to protect against. *Id.* at 829.

¶ 42    In the instant case, Ledeaux argues that Motorola's duty to him results from Arizona public policy as reflected in its adoption of OSHA workplace standards, which require that employers inform their employees of the hazards of all chemicals to which they may be exposed in the workplace, including reproductive toxins causing chromosomal damage to fetuses. See Ariz. Rev. Stat. Ann. § 23-410 (2024); Ariz. Admin. Code § R20-5-602 (2022) (adopting federal OSHA workplace standards); 29 C.F.R. § 1910.1200 & Appendix A (2020) (setting forth the requirement that employers inform employees of the hazards of reproductive toxins). Ledeaux contends that

Arizona's adoption of these OSHA workplace standards is designed to reduce employees' exposures to reproductively toxic chemicals, thereby protecting their future offspring from developing birth defects. As the offspring of a Motorola employee exposed to reproductively toxic chemicals in its Arizona semiconductor manufacturing plant, plaintiff contends he is a member of the class of persons that the OSHA workplace standards were designed to protect. As such, Ledeaux argues that Motorola owed him a duty of care under the OSHA standards.

¶ 43    Ledeaux's argument fails because the Arizona Court of Appeals has held that a plaintiff may not bring a cause of action under Arizona law for personal injuries based on a violation of the OSHA standards. *Wendland v. AdobeAir, Inc.*, 221 P.3d 390, 393 (Ariz. Ct. App. 2009). Instead, "causes of action for personal injuries must be based on the claimed breach of a duty created under the common law, contract, or *another statute*." (Emphasis added.) *Id. Wendland* remains good law in Arizona. Accordingly, Ledeaux's cause of action against Motorola cannot be based on its alleged breach of a duty of care created under the OSHA workplace standards adopted in Arizona.

¶ 44    Ledeaux also argues that Motorola owed him a duty of care arising from public policy founded on Arizona's Civil Rights Act (Ariz. Rev. Stat. Ann. § 41-1463 (2021)) as well as the Arizona Constitution's equal privileges and immunities clause (Ariz. Const., art. 2, § 13) and anti-abrogation clause (Ariz. Const., art. 18, § 6). Ledeaux further contends that Motorola owed him a duty of care arising from public policy founded in the common law of Arizona, and he cites in support *Myers v. Hoffman-La Roche, Inc.*, 170 P.3d 254 (Ariz. Ct. App. 2007), *Kenyon v. Hammer*, 688 P.2d 961 (Ariz. 1984) (*en banc*), *Summerfield v. Superior Court*, 698 P.2d 712 (Ariz. 1985) (*en banc*), and *Walker v. Mart*, 790 P.2d 735 (Ariz. 1990) (*en banc*). Ledeaux's arguments fail, as none of the statutes, constitutional provisions, or cited cases address an Arizona employer's duty

to warn its employees of the risk that exposures to reproductive chemicals in the workplace may cause birth defects to future offspring and to take preventative measures.

¶ 45    Finally, Ledeaux argues that Motorola owed him a duty of care under the Restatement (Second) of Torts § 324A (1965), which the Arizona Supreme Court adopted in *Stanley v. McCarver*, 92 P.3d 849, 853 (Ariz. 2004) (*en banc*). See *Quiroz*, 416 P.3d at 831 (holding that a duty may arise from Restatement sections consistent with Arizona law).[1] Section 324A states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm[.]"
>
> Restatement (Second) of Torts § 324A (1965).

¶ 46    Ledeaux argues that, by developing a reproductive health policy, Motorola undertook a duty to render services to its employees, including his father Mark, necessary for the protection of their future offspring. According to Ledeaux's experts, though, Motorola's attempts at such a reproductive health policy were incomplete, confusing, and ineffective. Ledeaux argues that Motorola's failure to exercise reasonable care in formulating the reproductive health policy actually increased the risk of harm to him by encouraging Mark to continue to expose himself to

---

[1]Motorola argues that section 324A relies on foreseeability to determine duty and therefore is inconsistent with *Gipson* and should not be followed. We disagree, as the Arizona Supreme Court has reaffirmed, post-*Gipson*, its adoption of section 324A. See *Cal-Am Properties Inc. v. Edais Engineering Inc.*, 509 P.3d 386, 391 (Ariz. 2022).

the toxic chemicals that ultimately caused Ledeaux's birth defects. As such, Ledeaux contends that Motorola is subject to liability under section 324A.

¶ 47     Ledeaux's argument that Motorola owed him a duty under section 324A is contingent on a finding that its allegedly negligent reproductive health policy led to Mark's exposure to toxic chemicals that increased the risk that Ledeaux would suffer birth defects. However, the scientific evidence in the record is conflicting on the risk posed to Ledeaux by his father's exposure to the chemicals at issue. Specifically, the supplemental report filed by Bearer, Mattison, Finnell, and Cabrera concluded that Mark's workplace exposures to acetone, ethyl benzene, isopropyl alcohol, hydrofluoric acid, and nitric acid were a substantial factor and proximate cause of Ledeaux's birth defects. The supplemental report's findings were supported by the epidemiological studies cited in the joint report, as well by the Lin report and the SIA and IBM studies. By contrast, the McDonald study found "no convincing evidence" linking paternal employment in the manufacturing sector, including inspecting, fabricating, and repairing electrical equipment (such as wafers), with subsequent birth defects in their future offspring. Such conflicting scientific evidence regarding whether paternal exposure to toxic chemicals causes birth defects in future offspring raises a genuine issue of material fact as to whether Ledeaux's risk of birth defects was increased by his father's exposures to toxic chemicals while working for Motorola. This question of material fact must be resolved by the trier of fact prior to any finding of duty under section 324A.

¶ 48    Motorola argues that under Arizona law there can be no duty owed for injury-causing conduct that occurred prior to conception. We addressed this same issue in *Ledeaux I*[2] and agree with its holding that fundamental tort law in Arizona "does not prohibit imposing liability on a tortfeasor for conduct that causes an injury regardless of whether that conduct occurred pre-conception and the resulting injury manifested after the child's conception and birth." *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 38. "To preclude a cause of action for negligence based solely on the fact that the negligence occurred before plaintiffs' conception would leave a party with no recourse for injuries caused by another," which is contrary to Arizona law. *Id.* ¶ 39.

¶ 49    Motorola argues, though, that we should affirm the summary judgment order in its favor because the Arizona workers' compensation statute provides the exclusive remedy for a work-related injury sustained by an employee. See Ariz. Rev. Stat. Ann. § 23-1022(A) (2024). Motorola acknowledges that Ledeaux was not one of its employees, but it argues that, according to his complaint, he would not have suffered the birth defects in the absence of Mark's workplace exposure to the toxic chemicals, which affected his testes and sperm and constituted a workplace injury covered under the Arizona workers' compensation statute. See *id.* As such, Motorola contends that Ledeaux's negligence claims are derivative of Mark's workplace injury and can only be brought under the Arizona workers' compensation statute.

¶ 50    We addressed this same issue in *Ledeaux I*, where we noted that, under Arizona law, the type of derivative claims that must be brought under the workers' compensation statute are those where the plaintiff was not physically injured himself but suffered emotional or economic harm

---

[2]Although we are not bound to follow *Ledeaux I* under the doctrines of *stare decisis* and law of the case, we may consider the analysis contained therein for its persuasive value.

due to the physical injury to the employee, *e.g.*, claims for loss of consortium or wrongful death. *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 20 (citing *Mardian Construction Co. v. Superior Court*, 754 P.2d 1378, 1381 (Ariz. Ct. App. 1988)). In the instant case, Ledeaux seeks recovery for his *own* injuries (the severe birth defects suffered by him) separate and apart from any workplace injury to Mark. As such, the exclusive remedy provision of the Arizona workers' compensation statute does not apply here.

¶ 51    Motorola next argues that we should affirm the summary judgment order in its favor because none of Ledeaux's experts specifically opined that his birth defects were proximately caused by Mark's chemical exposure in the workplace. To the contrary, the supplemental report prepared by Bearer, Mattison, Finnell, and Cabrera specifically found that Ledeaux's particular birth defects were proximately caused by Mark's workplace exposure to the toxic chemicals at issue here. As discussed earlier in this opinion, there was a contrary study from McDonald calling into question whether a father's exposure to toxic chemicals during the manufacturing of semiconductors can cause his future offspring to suffer birth defects. Such a conflict in the evidence raises a question of material fact that must be resolved by the trier of fact.

¶ 52    Accordingly, we reverse the order granting summary judgment for Motorola on Ledeaux's negligence count and remand for further proceedings.

¶ 53    Next, we address the grant of summary judgment for Motorola on Ledeaux's willful and wanton conduct count. In Arizona, willful and wanton misconduct is recognized as a form of aggravated or gross negligence. *Id.* ¶ 48 (citing *Williams v. Thude*, 934 P.2d 1349, 1351 (Ariz. 1997) (*en banc*)). To prove aggravated or gross negligence, *i.e.*, willful and wanton misconduct, plaintiff must establish the elements of negligence (duty, breach, and proximate cause) along with facts establishing that the negligent conduct created an extreme risk of harm to others and that the

defendant knew of the extreme risk but proceeded anyway. *Id.* ¶ 49 (citing *Arizona Independent Redistricting Comm'n v. Brewer*, 275 P.3d 1267, 1276 (Ariz. 2012), and *DeElena v. Southern Pacific Co.*, 592 P.2d 759, 762-63 (Ariz. 1979) (*en banc*)).

¶ 54    Here, the circuit court granted summary judgment for Motorola on Ledeaux's willful and wanton conduct count on the basis that it owed no duty toward him as a matter of law. We already have found that questions of material fact exist regarding whether Ledeaux's risk of birth defects was increased by his father's exposure to toxic chemicals in the workplace, which must be resolved prior to determining whether Motorola owed him a duty of care. Given these questions of material fact, we reverse the grant of summary judgment for Motorola on Ledeaux's willful and wanton conduct count and remand for further proceedings.

¶ 55    Next, we address the circuit court's order granting summary judgment for Motorola on Ledeaux's parents' claim for parental loss of child consortium. Parental loss of child consortium is a viable claim in Arizona that provides parents with a remedy in damages against a negligent tortfeasor whose actions have so severely injured the parents' child that they are deprived of his society, companionship, love, and support. *Howard Frank, M.D., P.C. v. Superior Court*, 722 P.2d 955, 961 (Ariz. 1986) (*en banc*). In the instant case, the circuit court determined that the claim for parental loss of child consortium fails because Motorola owed Ledeaux no duty of care and, as such, that Motorola was not a tortfeasor against whom such a claim could be brought. As we have already discussed, there are material questions of fact that must be resolved prior to a determination of whether Motorola owed Ledeaux a duty. Accordingly, we reverse the order granting summary judgment for Motorola on the claim for parental loss of child consortium and remand for further proceedings.

¶ 56    In so holding, we note that no argument is made on appeal that the parental loss of child consortium claim must be brought under the Arizona workers' compensation statute. Even if such an argument had been made on appeal, we would note that the claim does not fall within the Arizona workers' compensation statute's exclusive remedy provision, as the loss of consortium allegedly results from Ledeaux's injuries, not the workplace injuries of his father. See our discussion earlier in this opinion regarding when a claim must be brought under the Arizona workers' compensation statute.

¶ 57    Finally, we address the circuit court's order denying Ledeaux leave to amend his complaint to add a claim for punitive damages. In Arizona, punitive damages may be awarded where the claimant proves willful and wanton misconduct. *Saucedo v. Salvation Army*, 24 P.3d 1274, 1277 (Ariz. Ct. App. 2001). The circuit court here determined that, because it granted summary judgment in favor of Motorola on the willful and wanton conduct count, Ledeaux had no basis for an assertion of punitive damages. As we are reversing the order granting summary judgment for Motorola on the willful and wanton conduct count and remanding for further proceedings, the court's stated basis for denying Ledeaux leave to amend his complaint to add a claim for punitive damages no longer exists. Accordingly, we reverse the order denying Ledeaux leave to amend his complaint and remand for reconsideration thereof.

¶ 58                                    II. Arballo

¶ 59    Arballo was born on December 30, 1985, with tuberous sclerosis (TSC), a genetic disorder resulting from mutations in his TSC2 gene. TSC is associated with the formation of benign tumors in various organs of the body that has caused Arballo to suffer psychomotor delay, intractable epilepsy, seizure disorder, autism, severe developmental delay, and motor delay. Arballo filed a

complaint against Motorola alleging that his TSC resulted from Motorola's negligence and willful and wanton misconduct in exposing his mother, Rosa, to reproductively toxic chemicals.

¶ 60      During discovery, Rosa testified that, in the year prior to Arballo's birth, she worked as a quality assurance inspector at Motorola's Mesa, Arizona, facility. Rosa's duties included inspecting wafers under a microscope, cleaning the microscope lens with acetone, and visually monitoring workers as they performed their jobs. Her workstation was located in an area of the facility known as "Bipolar II," which contained the photolithography, etch, and diffusion bays.

¶ 61      Rosa wore a hood, gown, special shoes and gloves (collectively known as a bunny suit) while working in Bipolar II. Sometimes when cleaning her microscope, acetone seeped through her gloves and contacted her hands. She smelled various other photoresist chemicals near her work station.

¶ 62      Stewart, the environmental health engineering expert, filed a report stating that Rosa would have been exposed to the following chemicals and solvents while working as a quality assurance inspector: acetone, nitric acid, hydrofluoric acid, hexamethyl disilaze (HMDS), isopropyl alcohol, methyl ethyl ketone (MEK), pos res component (n methyl pyrrolidone (NMP)), and propylene glycol-1-methylether-2-acetate (PGMEA). The joint report and the IBM and SIA studies identified all these chemicals and solvents as being reproductively toxic.

¶ 63      Bearer, Mattison, Finnell, and Cabrera filed a supplemental report stating that Rosa's occupational exposures to these reproductive toxins were a substantial factor and proximate cause of Arballo's TSC and that there were no alternative causes or explanations. The supplemental report did not detail how Rosa's exposures to the reproductive toxins caused Arballo's TSC. However, in his deposition testimony, Cabrera explained that Rosa's exposures could have caused

chromosomal damage to her eggs, which resulted in the mutation of Arballo's TSC2 gene after conception.

¶ 64    Elsewhere in the record, though, there was evidence calling into question the link between Rosa's chemical exposures and Arballo's TSC. Specifically, Cabrera admitted in his deposition that he was unaware of any scientific studies finding that a mother's exposure to toxic chemicals caused her future offspring's TSC2 gene mutations. Mattison also testified that he was unaware of any such studies. Bearer testified that she was unaware of any scientific studies finding that a mother's work in the semiconductor industry caused her future offspring to be born with TSC.

¶ 65    Following discovery, Motorola moved for summary judgment on Arballo's complaint based on lack of duty. The circuit court found that Arizona law governed the substantive issues, while Illinois law governed the procedural issues. The court granted the summary judgment motion and denied Arballo's motion to amend the complaint to allege punitive damages. Arballo appeals.

¶ 66    The parties rehash the same arguments we addressed earlier in this opinion in the Ledeaux appeal regarding law of the case; *stare decisis*; the exclusive remedy provided by the Arizona workers' compensation statute; the feasibility of allowing recovery for preconception torts; and whether Motorola owed Arballo a duty under OSHA, the Arizona Constitution, and the common law. In accordance with our analysis earlier in this opinion, we reject Arballo's arguments that the law of the case and *stare decisis* require us to follow the reasoning of *Ledeaux I* in its duty analysis, where that case involved different parties and a different procedural posture than the one here. We reject Motorola's argument that Arballo's claims may be redressed only under the Arizona workers' compensation statute, where he is seeking recovery for his own injuries and not those of his mother. We find that Arizona law allows for the recovery of damages for preconception torts,

where those torts have been proven by competent evidence. We find that Motorola owed Arballo no duty under OSHA, the Arizona Constitution, or the common law.

¶ 67    We proceed to address whether Motorola owed Arballo a duty under section 324A of the Restatement (Second) of Torts. Section 324A provides that one who undertakes to render services to another, that he should recognize as necessary for the protection of a third person, is subject to liability to the third person for physical harm resulting from the failure to exercise reasonable care in the undertaking, if the failure to exercise reasonable care increased the risk of such harm. Restatement (Second) of Torts § 324A(a) (1965).

¶ 68    Arballo argues that, by developing a reproductive health policy, Motorola undertook a duty to render services to its employees, including his mother Rosa, necessary for the protection of their future offspring. According to Arballo's experts, though, Motorola's attempts at such a reproductive health policy were incomplete, confusing, and ineffective. Arballo argues that Motorola's failure to exercise reasonable care in formulating the reproductive health policy actually increased the risk of harm to him by encouraging Rosa to continue to expose herself to the toxic chemicals that ultimately caused chromosomal damage to her eggs, causing the mutation in Arballo's TSC2 gene after conception. As such, Arballo contends that Motorola is subject to liability under section 324A.

¶ 69    There is a conflict in the scientific evidence regarding whether maternal exposure to reproductive toxins causes chromosomal changes to the mother's eggs that can lead to mutations in her future offspring's TSC2 gene. On the one hand, the supplemental report (as explicated by Cabrera) indicates such a causal connection exists. On the other hand, Bearer, Mattison, and Cabrera each testified that there were no scientific studies substantiating such a conclusion. This conflicting evidence raises a question of material fact that must be resolved by the trier of fact

-23-

prior to any finding as to whether Motorola owed Arballo a duty under section 324A and proximately caused his injuries. Accordingly, we reverse the grant of summary judgment for Motorola on Arballo's negligence, willful and wanton conduct, and parental loss of child consortium claims, as well as the denial of his motion to amend the complaint to allege punitive damages, all of which were predicated on the court's erroneous finding as a matter of law that Motorola owed Arballo no duty. The court's finding of no duty was premature given the material question of fact regarding whether Rosa's exposure to the toxic chemicals in Motorola's semiconductor facility caused the chromosomal damage to her eggs that led to the mutation in Arballo's TSC2 gene.

¶ 70                                    III. Conclusion

¶ 71    In case number 1-22-0891, we reverse the order granting summary judgment for Motorola on Ledeaux's negligence and willful and wanton conduct counts and denying him leave to amend his complaint to add a claim for punitive damages and remand for further proceedings.

¶ 72    In case number 1-22-0886, we reverse the order granting summary judgment for Motorola on Arballo's negligence and willful and wanton conduct counts and denying him leave to amend the complaint to add a claim for punitive damages and remand for further proceedings.

¶ 73    No. 1-22-0886, Reversed and remanded.

¶ 74    No. 1-22-0891, Reversed and remanded.

*Ledeaux v. Motorola Solutions, Inc.*, **2024 IL App (1st) 220886**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos, 10-L-8503, 19-L-10140; the Hon. Irwin J. Solganick, Judge, presiding. |
| **Attorneys for Appellant:** | Michael J. Lubeck and Kevin J. Conway, of Cooney & Conway, of Chicago, and Michael T. Reagan, of Ottawa, for appellants. |
| **Attorneys for Appellee:** | J. Hayes Ryan and Todd M. Murphy, of Gordon Rees Scully Mansukhani, and Karen Kies DeGrand, Scott L. Howie, and Jeffrey E. Eippert, of Donohue Brown Mathewson & Smyth LLC, both of Chicago, for appellee. |